1 Steven N. Williams (175489);
   swilliams@cpmlegal.com
2 Nancy L. Fineman (124970);
   nfineman@cpmlegal.com
3 Matthew K. Edling (250940);
   medling@cpmlegal.com
4 **COTCHETT, PITRE & McCARTHY**
   840 Malcolm Road, Suite 200
5 Burlingame, CA 94010
   Telephone: (650) 697-6000
6 Facsimile: (650) 697-0577

E-filing

7 *Attorneys for Plaintiffs and the Proposed Classes*

8

9

10 **UNITED STATES DISTRICT COURT**

11 **NORTHERN DISTRICT OF CALIFORNIA**

BZ

12 FREEDOM CANDLE COMPANY,          ) **Case No.**
   A SOLE PROPRIETORSHIP,           )
13 WIDENSKY'S CLOTHING BOUTIQUE INC., ) **CV 09        3928**
   FORGET-ME-NOT KEEPSAKES          )
14 & CRAFTS, INC., ON BEHALF OF     ) **CLASS ACTION COMPLAINT**
   THEMSELVES AND ALL OTHERS        ) **AND DEMAND FOR JURY TRIAL**
15 SIMILARLY SITUATED,              )
                                    )
16       PLAINTIFFS,                )
                                    )
17 VS.                              )
                                    )
18 GANZ, INC., AND GANZ U.S.A. LLC, )
                                    )
19       DEFENDANTS.                )
                                    )
20 _____ )

21

22

23

24

25

26

27

28

LAW OFFICES
COTCHETT,
PITRE
& McCARTHY

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

**TABLE OF CONTENTS**

**Page(s)**

I. INTRODUCTION ........................................................ 1

II. NATURE OF THE ACTION AND THE PRODUCT MARKETS ................. 1

III. JURISDICTION AND VENUE ............................................ 4

IV. PARTIES .............................................................. 5

    A. PLAINTIFFS ..................................................... 5

    B. DEFENDANTS .................................................. 6

    C. AGENCY ....................................................... 6

V. CLASS ALLEGATIONS .................................................. 7

VI. TRADE AND COMMERCE ................................................ 9

    A. GANZ USED ITS DOMINANT POSITION IN THE MARKET FOR TOYS COMBINED WITH ONLINE GAMING TO FORCE THE ILLEGAL TYING ARRANGEMENT UPON RETAILERS ................................. 9

        1. Consistent With The Reasonable Interchangeability Standard, The Relevant Product Market Is Toys Combined With Online Gaming .................................................... 9

        2. Webkinz Possesses A Dominant Share Of The Relevant Product Market ................................................... 10

            a. Webkinz Possesses Brand Equity And Is More Popular Than Its Competitors ................................. 10

            b. Webkinz Outsells Its Competitors By A Large Margin ........ 10

            c. Webkinz World Is Visited Far More Often Than Its Competitors' Websites ................................. 11

            d. The Time Spent On Webkinz World Far Outstrips Its Competitors ...................................... 13

        3. Strong Barriers To Entry Exist In The Relevant Market ............. 14

        4. The Nature Of The Tied Product Markets ........................ 15

VII. DEFENDANTS' WRONGFUL CONDUCT AND ANTITRUST VIOLATIONS .... 17

VIII. PLAINTIFFS AND THE SHERMAN/CLAYTON CLASS MEMBERS SUFFERED ANTITRUST INJURY BECAUSE OF DEFENDANTS' CONDUCT ......................................................... 19

IX. DEFENDANTS' UNFAIR AND DECEPTIVE PRACTICES .................... 19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

⊕
LAW OFFICES
COTCHETT,
PITRE
& MCCARTHY

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

X.     COUNT I
       (Violation of Sherman Act § 1 and Clayton Act § 3) .......................... 21

XI.    COUNT II
       (Violation of Connecticut Unfair Trade Practices Act, Gen. Stat. Ann.
       § 42-110a et seq.) ......................................................... 23

XII.   COUNT III
       (Violation of Florida's Deceptive and Unfair Trade Practices Act,
       Fla. Stat. §§ 501.201 *et seq.*) ........................................... 24

XIII.  COUNT IV
       (Violation of New York's Consumer Protection From Deceptive Acts and Practices
       statutes, N.Y. Gen. Bus. Law §§ 349 *et seq.*) ............................. 25

XIV.   PRAYER FOR RELIEF ........................................................... 27

       JURY TRIAL DEMAND ........................................................... 29

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LAW OFFICES
COTCHETT,
PITRE
& MCCARTHY

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

**I.**

**INTRODUCTION**

1. Plaintiffs, by their undersigned attorneys, individually and on behalf of the class described below, bring this action for treble damages and injunctive relief under the Sherman Antitrust Act and the Clayton Antitrust Act and for damages under the laws of a) Connecticut, b) Florida, and c) New York, against Defendants GANZ, INC. and GANZ U.S.A., LLC (collectively referred to herein as "Ganz").

**II.**

**NATURE OF THE ACTION AND THE PRODUCT MARKETS**

2. This action arises from the illegal acts of the Defendants in conditioning the sale of Webkinz (the "tying product") on the purchase of unrelated Ganz products from the tied product markets (the "tied Ganz products"), and Defendants' failure to deliver properly ordered Webkinz in a reasonably timely manner. Webkinz includes Lil'Kinz, which are smaller, less expensive versions of Webkinz. The Webkinz line also includes accessories and Webkinz branded products, including, but not limited to, clothing for the Webkinz, pet carriers, trading cards, bookmarks, pencil cases, and purses.

3. Webkinz is a combined toy and online game. Each Webkinz costs between $10 and $15 and comes with a code that allows the user to unlock a Web site called Webkinz World that offers online games and other activities (www.webkinz.com). The main attraction of Webkinz World is the games. Once in Webkinz World, the user takes care of a virtual pet by earning "kinz cash" from playing games. The user cashes in their "kinz cash" to buy food, houses, and other items for their virtual pet. The code is valid for one year, after which the user must purchase another Webkinz to continue to have access to Webkinz World.

4. Ganz initially sold Webkinz primarily through its established network of small retailers and gift shops. When Ganz first introduced Webkinz to the marketplace it had no special requirements for the purchase of Webkinz. Shortly after the introduction of Webkinz however, Ganz began requiring retailers to purchase from Ganz's "core line" before they could become eligible to order Webkinz (or any product from the Webkinz line). This requirement

1  continues to date. A Ganz sales representative presents a retailer with a selection of products
2  from Ganz's core product line that are representative of or similar to products the retailer might
3  sell. The retailer decides from this menu of choices which of the Ganz core products it will
4  purchase to meet the requirement.

5      5.     After placing the required order for the tied Ganz products, the retailer can then
6  submit an order for Webkinz. Ganz does not guarantee approval of the retailer's order for
7  Webkinz nor that the product will be shipped even if an order was accepted. Through this co-
8  purchasing requirement, the ability to purchase Webkinz is conditioned on first purchasing tied
9  Ganz products. Ganz does not permit the retailer to return any of the tied Ganz products that it
10 does not sell.

11     6.     In addition to this co-purchasing requirement, Ganz has a Loyalty Program for
12 Webkinz retailers that gives priority shipping for ordering more than specified levels of core
13 products (the non-Webkinz products) within a twelve month period. Also, the greater the dollar
14 value of core products ordered, the greater the maximum number of pieces the retailer can order
15 of each Webkinz style.

16     7.     The tying product market is the United States market for Toys Combined With
17 Online Gaming ("toys combined with online gaming" or the "relevant market"). The market for
18 toys combined with online gaming is defined as toys whose purchase is required to gain access to
19 a website that includes games.

20     8.     Ganz possesses sufficient power in the relevant market to force Plaintiffs and
21 members of the Class into this tying arrangement. Webkinz has about an 80% share of the
22 market for toys combined with online gaming.

23     9.     Ganz's tying arrangement conditions the purchase of Webkinz on the purchase of
24 products from one or more tied product markets, so long as the total purchase of the tied products
25 surpasses a minimum amount. All of the required tied product purchases are Ganz products.
26 Collectively, these tied product markets are referred to herein as the "tied product markets" or the
27 "tied Ganz products."

28

❸
LAW OFFICES
COTCHETT,
PITRE
& MCCARTHY

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

2

10. As discussed in further detail below, the tied product markets are: (1) the Plush market, (2) the Souvenirs & Novelties market, (3) the Home Decorative Accessories market, and (4) the Seasonal Decorations market. Each of these markets is recognized as a distinct submarket by the giftware industry. Ganz's core line includes products that fall within each of these tied product markets. The relevant geographic market for each of the tied products is the United States.

11. Defendants' actions have caused monetary injury to Plaintiffs and members of the Class by forcing them to purchase the tied Ganz products before being permitted to purchase Webkinz. Defendants' actions have unlawfully restrained trade and injured competition in the tying and tied product markets. Defendants' actions have also allowed them to reap wrongful profits.

12. Plaintiffs bring this action on behalf of all persons and entities in the United States who established an account with Ganz and purchased Webkinz from Ganz on the condition that they first order products from Ganz's "core line" of products that fall within the four identified tied product markets.

13. Plaintiff, Freedom Candle Company, brings this action on behalf of all persons and entities in the State of Connecticut who ordered Webkinz and "core line" products but whose shipments of Webkinz products Ganz failed to deliver in a reasonably timely manner.

14. Plaintiff, Widensky's Clothing Boutique, Inc., brings this action on behalf of all persons and entities in the State of Florida who ordered Webkinz and "core line" products but whose shipments of Webkinz products Ganz failed to deliver in a reasonably timely manner.

15. Plaintiff, Forget-me-not Keepsakes & Crafts, Inc., brings this action on behalf of all persons and entities in the State of New York who ordered Webkinz and "core line" products but whose shipments of Webkinz products Ganz failed to deliver in a reasonably timely manner.

/ / /


LAW OFFICES
COTCHETT,
PITRE
& MCCARTHY

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

3

## III.

## JURISDICTION AND VENUE

16. Plaintiffs bring this action to obtain injunctive relief and to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff and the members of the Class as a result of violations of Section 1 of the Sherman Act, 15 U.S.C. § 1 and Section 3 of the Clayton Act, 15 U.S.C. § 14.

17. This Court has jurisdiction over the subject matter of this dispute under the provisions of Sections 1331, 1337 and 2201 of Title 28 of the United States Code, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. This Court has supplemental jurisdiction over Plaintiffs' state law claims in that those state law claims are so related to Plaintiffs' federal claim under § 1 of the Sherman Act (15 U.S.C. § 1) and/or § 3 of the Clayton Act (15 U.S.C. § 14) that they "form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367.

18. This Court has jurisdiction over this dispute pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because there are 100 or more class members and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs. Additionally, at least one Class member is a citizen of a state different from Ganz.

19. This Court has jurisdiction over each of the Defendants by virtue of their nationwide contacts and business activities, including their extensive contacts and business activities in this district.

20. Venue is proper in this district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b), (c), and (d) because the Defendants resided, transacted business, were found, or had agents in this District. Each of the named Plaintiffs residing in Connecticut, Florida, and New York could have originally brought this action in this District because the Defendants resided, transacted business, were found, or had agents in this District, and a substantial part of the events giving rise to the claims at issue in this Complaint emanated from this District.

///

⊕
LAW OFFICES
COTCHETT,
PITRE
& MCCARTHY

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

4

## IV.

## PARTIES

### A. PLAINTIFFS

21. Plaintiff **FREEDOM CANDLE COMPANY** is a sole proprietorship with its principal place of business in Granby, Connecticut. Ganz forced Freedom Candle Company to purchase Ganz products unrelated to Webkinz from its "core line" before it could become eligible to purchase Webkinz for sale. Plaintiff has limited shelf space to stock and sell miscellaneous giftware items such as plush toys, gifts and novelties, and home or seasonal decorations. Absent Ganz's illegal tying arrangement, Plaintiff would have been able to purchase Webkinz products separately and high quality items other than Ganz tied "core line" products on different terms from Ganz's competitors and provided those choices to its customers. As a result of Ganz's antitrust violations and unfair and deceptive business practices alleged herein, Plaintiff has suffered pecuniary injury and damages. Additionally, Ganz' shipments of Webkinz products were not delivered in a reasonably timely manner.

22. Plaintiff **WIDENSKY'S CLOTHING BOUTIQUE, INC.** is a corporation with its principal place of business in Coral Spring, Florida. Ganz forced Widensky's Clothing Boutique, Inc. to purchase Ganz products unrelated to Webkinz from its "core line" before it could become eligible to purchase Webkinz for sale. Plaintiff has limited shelf space to stock and sell miscellaneous giftware items such as plush toys, gifts and novelties, and home or seasonal decorations. Absent Ganz's illegal tying arrangement, Plaintiff would have been able to purchase Webkinz products separately and high quality items other than Ganz tied "core line" products on different terms from Ganz's competitors and provided those choices to its customers. As a result of Ganz's antitrust violations and unfair and deceptive business practices alleged herein, Plaintiff has suffered pecuniary injury and damages. Additionally, Ganz' shipments of Webkinz products were not delivered in a reasonably timely manner.

23. Plaintiff **FORGET-ME-NOT KEEPSAKES & CRAFTS, INC**. is a corporation with its principal place of business in Manorville, New York. Ganz forced Forget-me-not Keepsakes & Crafts, Inc. to purchase Ganz products unrelated to Webkinz from its "core line"

1 before it could become eligible to purchase Webkinz for sale. Plaintiff has limited shelf space to
2 stock and sell miscellaneous giftware items such as plush toys, gifts and novelties, and home or
3 seasonal decorations. Absent Ganz's illegal tying arrangement, Plaintiff would have been able to
4 purchase Webkinz products separately and high quality items other than Ganz tied "core line"
5 products on different terms from Ganz's competitors and provided those choices to its customers.
6 As a result of Ganz's antitrust violations and unfair and deceptive business practices alleged
7 herein, Plaintiff has suffered pecuniary injury and damages. Additionally, Ganz' shipments of
8 Webkinz products were not delivered in a reasonably timely manner.

**B.    DEFENDANTS**

10    24.    Defendant **GANZ, INC.** is a private corporation duly organized and existing
11 under the laws of Delaware with its principal place of business in Woodbridge, Ontario, Canada.
12 Ganz, Inc. is responsible for formulating and overseeing the marketing, distribution, and sales
13 policies of Ganz products. Founded in 1950, Ganz is in the business of creating and selling toys
14 and giftware.

15    25.    Defendant **GANZ U.S.A., LLC** is a limited liability company duly organized and
16 existing under the laws of Delaware with its principal place of business in Cheektowaga, New
17 York. Ganz U.S.A., LLC is a wholly-owned business unit of Ganz, Inc.

18    26.    Defendants Ganz, Inc. And Ganz U.S.A., LLC transact business in the Northern
19 District of California. The company's Area Sales Representatives and Northern California
20 Regional Manager also visit stores throughout the district to sell Webkinz and the tied Ganz
21 products.

**C.    AGENCY**

23    27.    At all times relevant to this complaint, Defendants, and each of them, were acting
24 as the agents or joint venturers of each other, and were acting within the course and scope of their
25 agency with the full knowledge, consent, permission, authorization, and ratification, either
26 express or implied, of each of the other Defendants in performing the acts alleged in this
27 complaint.

28    / / /



LAW OFFICES
COTCHETT,
PITRE
& MCCARTHY

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

6

## V.

## CLASS ALLEGATIONS

28.    Plaintiffs bring this action on their own behalf and as class action pursuant to

Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following

Classes:

**Sherman/Clayton Class**
All persons and entities in the United States who were required as a condition of their purchase of Webkinz to purchase products from Ganz's "core line" of products within the Plush Market, or Souvenirs and Novelties Market, or Home Decorative Accessories Market, or Seasonal Decorations Market.

**Connecticut Class**

All persons and entities in Connecticut who were required as a condition of their purchase of Webkinz to purchase products from Ganz's "core line" of products but whose shipments of Webkinz products Ganz failed to deliver in a reasonably timely manner.

**Florida Class**

All persons and entities in Florida who were required as a condition of their purchase of Webkinz to purchase products from Ganz's "core line" of products but whose shipments of Webkinz products Ganz failed to deliver in a reasonably timely manner.

**New York Class**

All persons and entities in New York who were required as a condition of their purchase of Webkinz to purchase products from Ganz's "core line" of products but whose shipments of Webkinz products Ganz failed to deliver in a reasonably timely manner.

29.    Because such information is in the exclusive control of Defendants, Plaintiffs do

not know the exact number of Class members. However, Plaintiffs believe that Class members

number at least in the hundreds and are sufficiently numerous and geographically dispersed

throughout the United States so that joinder of all Class members is impracticable.

30.    There are questions of law and fact common to the Classes. They include:

(a)    The definition of the relevant product market for Webkinz;

(b)    Whether Ganz implemented an unlawful and illegal tying arrangement that

conditioned retailers' ability to purchase Webkinz on their purchase of tied

Ganz products in the United States in violation of Section 1 of the

Sherman Act and Section 3 of the Clayton Act;

(c)  Whether Plaintiffs and the other members of the Classes were injured by

reason of Ganz's unlawful conduct;

(d)  Whether Plaintiff, Freedom Candle Company, and other Connecticut Class

members were victims of unfair competition in violation of Connecticut

Unfair Trade Practices Act, Conn. Gen. Stat. Ann. § 42-110a *et seq.*

(e)  Whether Plaintiff, Widensky's Clothing Boutique Inc., and other Florida

Class members were victims of unfair competition in violation of the

Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et*

*seq.*;

(f)  Whether Plaintiff, Forget-me-not Keepsakes & Crafts, Inc., and other New

York Class members were victims of unfair competition in violation of

New York's Consumer Protection From Deceptive Acts and Practices

statutes, N.Y. Gen. Bus. Law §§ 349 *et seq.*; and

(g)  The appropriate measure of damages sustained by Plaintiffs and other

Class members.

31.  Plaintiffs' claims are typical of the claims of the Class members for each class that they seek to represent. Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs purchased Webkinz from the Defendants on the condition that they also purchase tied Ganz products, and Plaintiffs' interests are coincident with and not antagonistic to those of other members of the Class.

32.  The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members.

33.  A class action is superior to other methods for the fair and efficient adjudication of this controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.



LAW OFFICES
COTCHETT,
PITRE
& MCCARTHY

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

8

1    34.    Class treatment will also permit the adjudication of relatively small claims by

2  many Class members who otherwise could not afford to litigate an antitrust claim such as is

3  asserted in this complaint. This class action presents no difficulties in management that would

4  preclude maintenance as a class action. Finally, the Classes are readily definable and records of

5  the names and addresses of the members of the Classes exist in the files of Defendants.

6    35.    Plaintiffs have retained counsel experienced in complex class action litigation.

7  Counsel for Plaintiffs and the Classes will vigorously assert the claims of the Class members.

8                                            **VI.**

9                              **TRADE AND COMMERCE**

10    36.    Defendants sold Webkinz and the tied Ganz products in the United States in

11  interstate commerce, and the violations of law asserted herein have occurred in interstate

12  commerce.

13    37.    Defendant's unlawful conduct described herein affected a substantial amount of

14  United States interstate commerce in both the relevant market and the tied product markets.

15  **A.    GANZ USED ITS DOMINANT POSITION IN THE MARKET FOR TOYS
       COMBINED WITH ONLINE GAMING TO FORCE THE ILLEGAL TYING**
16     **ARRANGEMENT UPON RETAILERS**

17        **1.    Consistent With The Reasonable Interchangeability Standard,
              The Relevant Product Market Is Toys Combined With Online Gaming**
18

19    38.    The Supreme Court, in *Brown Shoe v. United States*, 370 U.S. 294, 325 (1962),

20  held that "the 'outer boundaries' of a product market are determined by the reasonable

21  interchangeability of use or the cross-elasticity of demand between the product itself and

22  substitutes for it."

23    39.    Applying this standard to Webkinz, two characteristics define products within the

24  relevant market. First, the consumer purchases a toy. Second, the toy contains a secret code or

25  password that allows the purchaser to access online games and other activities. Purchase of the

26  toy is required for online access. Examples include Littlest Pet Shop VIPs

27  (www.hasbro.com/littlestpetshop) and Shining Stars (www.shiningstars.com).

28

LAW OFFICES
COTCHETT,
PITRE
& MCCARTHY

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

9

1      40.     From these product characteristics, the relevant product market is the United

2 States market for toys combined with online gaming. Defining the relevant market as toys

3 combined with online gaming produces a set of products that are reasonably interchangeable in

4 use.

5      **2.     Webkinz Possesses A Dominant Share Of The Relevant Product Market**

6      41.     The available evidence suggests that Webkinz enjoys a dominant position in the

7 United States market for toys combined with online gaming.

8             **a.     Webkinz Possesses Brand Equity And Is More Popular Than Its Competitors**

9

10     42.     Webkinz enjoys great popularity and brand equity. Introduced in 2005, Webkinz

11 was an early entrant into the market. Accordingly, Webkinz has had time to establish itself in the

12 market as a premier brand. In 2007, girls six to eleven rated Webkinz as the "coolest" toy brand,

13 while boys of the same age rated Webkinz as the third coolest toy brand. Among girls, Webkinz

14 ranked above Bratz, Barbie, and Littlest Pet Shop. Girls ranked Webkinz as their favorite brand,

15 beating out heavyweights such as High School Musical, Hannah Montana, and Abercrombie &

16 Fitch. (Playthings, *Toys Still Tops With Kids – Barely; Kids share coolest brands heading into*

17 *the holidays,* January 1, 2008, pg. 2).

18             **b.     Webkinz Outsells Its Competitors By A Large Margin**

19     43.     Although Ganz does not regularly release sales figures, Webkinz sales have been

20 high. Anita Frazier of NPD Group estimates that Webkinz U.S. revenues were about $45 million

21 in 2006, which is prior to Webkinz's popularity booming in early 2007. Ganz claimed that as of

22 May 2007, more than 2 million Webkinz had been sold. One analyst estimates that Webkinz's

23 sales exceeded $100 million by late 2007. Similarly, Anita Frazier estimates that as of October

24 2007, Webkinz sales were triple those of 2006, suggesting that Webkinz sales in 2007 were at

25 least $135 million. At Limited Too, a popular mall store with girls, 11% of transactions in the

26 fourth quarter of 2007 involved a Webkinz product.

27     44.     Over 21% of retailers surveyed told Toy Directory Monthly that Webkinz was

28 their best selling item in 2007. For the period February 14, 2008 to March 14, 2008, four

⊕
LAW OFFICES
COTCHETT,
PITRE
& MCCARTHY

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

10

1 Webkinz pets (the Duck, Penguin, Collie, and Cow) were among the thirty top selling toys.
2 None of Webkinz's competitors in the relevant market were among the top thirty. In June 2008,
3 two Webkinz pets (the Panda and Penguin) were among the top twenty toy sellers at
4 Amazon.com. None of Webkinz's competitors in the relevant market were among the top
5 twenty.

6      45.     By comparison, sales of Shining Stars (www.shiningstars.com), Webkinz's
7 closest competitor in the market for toys combined with online gaming, has been falling. Russ
8 Berrie and Company, the manufacturer of Shining Stars, generally does not publicly release sales
9 figures for Shining Stars. However, the company announced that sales were $4 million in the
10 second quarter of 2007, the quarter during which Shining Stars was introduced. Assuming that
11 sales of Shining Stars held steady for the third and fourth quarters of 2007, sales of Shining Stars
12 were about $12 million in 2007. Since Shining Stars sell for about $15, about 800,000 Shining
13 Stars were sold in 2007 compared to at least 9 million Webkinz sold during 2007 equaling sales
14 of $135 million. In terms of both units and revenue, Webkinz's sales were therefore about 10
15 times greater than Shining Stars' sales in 2007. According to Russ Berrie, sales of Shining Stars
16 fell in the first and second quarters of 2008, but the company did not reveal the magnitude of the
17 decrease.

18      46.     Hasbro, the manufacturer of Littlest Pet Shop VIPs (www.littlestpetshop.com),
19 announced that almost 2 million VIP toys had been registered online globally through the second
20 quarter of 2008. By comparison, the Webkinz site has been online only in North America since
21 its introduction in 2005. Ganz announced plans in August 2008 to translate the Webkinz website
22 into multiple languages so that children around the world can play with each other online.

23          **c.    Webkinz World Is Visited Far More Often Than Its**
              **Competitors' Websites**

24

25      47.     Webkinz World is one of the most visited web sites aimed at children and teens.
26 In the absence of concrete sales data from each competitor, the number of unique U.S. visitors to
27 a website is a reasonable proxy of success in the market for toys combined with online gaming.
28 Since products within this market have a physical and online component, the website visitor data

®
LAW OFFICES
COTCHETT,
PITRE
& MCCARTHY

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

11

1 provides a useful data point for assessing market share. Even within the broader market of
2 virtual worlds, in July 2007 the Webkinz site had over 5 million unique U.S. visitors – more than
3 any other virtual world. Also as of July 2007, Webkinz had the most unique visitors among U.S.
4 children ages 2 to 11 of any web site. From January to July 2007, the number of unique visitors
5 to Webkinz increased by 175%. In March 2008, Webkinz attracted nearly 12 million unique
6 visitors. In fact, other than the Apple iPhone, Webkinz was the fastest rising search term in the
7 United States for 2007. According to Compete.com, since July 2007 Webkinz has had at least
8 3.9 million unique U.S. visitors per month. In July 2008, Webkinz had approximately 6.5
9 million unique visitors.

10     48. By comparison, Shining Stars had approximately 150,000 unique visitors in July
11 2008. For the period July 2007 through July 2008, Shining Stars had its highest number of
12 unique visitors in December 2007 with almost 450,000 visitors. The trend has been sharply
13 downward since then for Shining Stars, while Webkinz's visitor numbers have been above 6.5
14 million every month since December 2007. In July 2008, Webkinz had at least forty (40) times
15 as many unique visitors per month as Shining Stars.

16     49. Littlest Pet Shop's numbers are similar to Shining Stars'. In July 2008, Littlest
17 Pet Shop had about 175,000 unique visitors. For the period July 2007 through July 2008, Littlest
18 Pet Shop had its highest number of unique visitors in February 2008 with about 275,000 visitors.

19     50. From July 2007 to July 2008, Be-bratz had its highest number of unique visitors
20 in August 2007 – about 450,000. Since February 2008, the number of unique visitors to Be-bratz
21 has fallen from 150,000 to 80,000 in July 2008. In July 2008, Webkinz had eighty (80) times as
22 many visitors as Be-bratz.

23     51. During the period of July 2007 to July 2008, Ubfunkeys had its highest number of
24 unique visitors in August 2007 – about 110,000. Since November 2007, the number of unique
25 visitors to Ubfunkeys has fallen from 80,000 to 20,000 in July 2008. In July 2008, Webkinz had
26 more than three-hundred (300) times as many visitors as Ubfunkeys.

27

28 / / /

52. The unique visitor data is summarized in the following chart:

|  | Unique U.S. visitors in July 2008 | Highest number of unique visitors since July 2007 and month | Trend since month with most unique visitors |
|---|---|---|---|
| Webkinz | 6.5 million | 7 million in April 2008 | Steady |
| Shining Stars | 150,000 | 450,000 in December 2007 | Downward |
| Little Pet Shop VIPs | 175,000 | 275,000 in February 2008 | Downward |
| Be-Bratz | 80,000 | 450,000 in August 2007 | Downward |
| Ubfunkeys | 20,000 | 80,000 in November 2007 | Downward |

53. Website visitor data strongly suggests Webkinz's share of unique visitors to online gaming sites combined with a toy is approximately 80%. Visitors to the Webkinz site spend an average of 12 minutes per visit, indicating that the vast majority of visitors are not merely curious visitors, but have purchased and registered a toy to gain access to the website.

### d. The Time Spent On Webkinz World Far Outstrips Its Competitors

54. Online Attention paid to Webkinz dwarfs that of its competitors. Compete.com defines "Attention" as the total time spent on a domain as a percentage of the total time spent online by all U.S. Internet users. Attention is a measure of how people allocate their limited time to various websites. Attention is one measure of market share in the relevant market because products in the relevant market possess an online component.

55. The Attention data is summarized in the following chart:

|  | Attention in July 2008 | Change from June 2008 | Webkinz's Attention compared to competitors[1] |
|---|---|---|---|
| Webkinz | 0.13611% | 6.2% |  |
| Shining Stars | 0.00140% | -1.2% | 97 times greater |
| Little Pet Shop VIPs | 0.00054% | -9.2% | 250 times greater |
| Be-Bratz | 0.00053% | -9.3% | 258 times greater |
| Ubfunkeys | 0.00022% | -0.6% | 610 times greater |

---

[1] These figures are calculated using Attention data to the eighth decimal place. Results are rounded according to standard conventions.

LAW OFFICES
COTCHETT,
PITRE
& McCARTHY

1     56.    Taken together, the data on market share strongly suggests that Webkinz's

2 dominant market share gives it market power in the market for toys combined with online

3 gaming.

### 3. Strong Barriers To Entry Exist In The Relevant Market

5     57.    Not only does Webkinz possess a dominant market share near 80%, but there are

6 also barriers to entry in the market for toys combined with online gaming. Barriers to entry,

7 combined with Webkinz's dominant market share, show that Webkinz has market power in the

8 market for toys combined with online gaming.

9     58.    One powerful barrier to entry is the network effects present in the market for toys

10 combined with online gaming. A network effect exists where the value of a good or service

11 depends on the number of existing users. Network effects take hold after a critical mass has been

12 reached. After the critical mass is reached, the purchase of a good or service by another

13 consumer indirectly benefits those who already own the good. Websites such as social

14 networking sites and online gaming sites exhibit network effects. Both types of websites become

15 more valuable to users the more users they have.

16     59.    Webkinz has a social networking feature and an online gaming component. The

17 social networking feature is used primarily to invite other Webkinz users to play an online game.

18 If your friends are registered on Webkinz, you will want to purchase a Webkinz so that you can

19 invite your friends to play games together online. Because of Webkinz's large head start in the

20 relevant market, it benefits from network effects. Webkinz's installed base of users is much

21 larger than all of its competitors' combined in the relevant market. Potential competitors face the

22 problem of attracting customers when there are few others online. Because Webkinz's

23 competitors have minuscule market shares in the relevant market, they are unable to benefit from

24 network effects. Network effects make it extremely difficult for competitors to enter the market

25 and challenge Webkinz's dominant market share.

26     60.    Switching costs present another barrier to entry to the relevant market. Once users

27 have purchased a toy connected to one online gaming site and invested substantial time in that

28 site, they will be reluctant to purchase a different toy and spend large amounts of time on a

LAW OFFICES
COTCHETT,
PITRE
& MCCARTHY

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

14

1 different online gaming site. The gaming sites have features, such as currency specific to the site,
2 designed to lock users into that site.

3        61.     Webkinz requires a commitment of time and money. After users have found
4 friends and gaming partners in the Webkinz world, they have little incentive to switch to another
5 product in the relevant market (toys combined with online gaming). By measuring how
6 consumers allocate a scare resource – time – the Attention data supports the existence of
7 switching costs in the relevant market. As to money, Webkinz locks in users by making them
8 purchase another Webkinz after one year for continued access to Webkinz World. Users who
9 purchase any of the myriad accessories available in the Webkinz line (e.g, knapsack for carrying
10 Webkinz) further commit themselves to Webkinz, making it even more costly to switch to
11 another product in the market for toys combined with online gaming. Switching costs reduce the
12 threat of competition in the market for toys combined with online gaming.

13        62.     In addition, brand equity is a barrier to entry in the market for toys combined with
14 online gaming. Webkinz's immense popularity, high sales relative to competitors, number of
15 unique visitors, and commanding lead in Attention over its competitors shows the strength of the
16 Webkinz brand. As mentioned above, among children Webkinz's brand appeal is as strong as
17 any other brand, not just brands within the relevant market. Thus, potential competitors face a
18 formidable barrier to entering the relevant market and threatening Webkinz.

19     **4.**     **The Nature Of The Tied Product Markets**

20        63.     Ganz illegally conditioned the purchase of Webkinz to the purchase of products
21 from its core line. If a retailer is interested in purchasing Webkinz, a Ganz sales representative
22 presents it with products from its core line that it must select from to fulfill the co-purchasing
23 requirement. The representative presents the retailer with a selection of products that the
24 representative determines might be attractive to that retailer. For example, a small toy store is
25 likely to be shown "core line" products from Ganz's plush line. The retailer decides from these
26 choices which of the Ganz core products to purchase to meet the requirement.

27

28   / / /

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

15

1    64.    Ganz's core line of products includes products within four tied product markets:
2 the Plush market, Souvenirs & Novelties market, the Home Decorative Accessories market, and
3 the Seasonal Decorations market. These four product markets are the tied product markets.

4    65.    The Supreme Court has concluded that an economically distinct submarket within
5 a market properly constitutes a product market for antitrust purposes. *Brown Shoe*, 370 U.S. at
6 325, *citing U.S. v. E.I. du Pont de Nemours & Co.*, 383 U.S. 593-595 (1957).

7    66.    The Plush market is a tied product market. The Plush market is defined as the
8 United States market for plush toys that do not have an online gaming component. Plush toys are
9 usually, but not necessarily limited to, stuffed animals. The toy industry recognizes the Plush
10 market as a distinct submarket within the general toy market. Playthings, *Plush with ideas*, June
11 1, 2003. The Plush market defines a field of competition sufficiently distinct from the other three
12 tied product markets and from the relevant market. Ganz's core line includes products that fall
13 within the Plush market.

14    67.    The remaining three tied product markets are recognized as submarkets of the
15 giftware industry. *See, e.g.*, Unity Marketing, *Gifts & Decorative Accents Report, 2003: The*
16 *Market, The Industry, and Future Trends*, October 1, 2003.

17    68.    The Souvenirs and Novelties market is a tied product market. The Souvenirs &
18 Novelties market is defined as the United States market for the sale of items to souvenir and
19 novelty shops that are designed and manufactured to be bought and/or given as gifts for personal
20 reasons or special events. This market includes, but is not limited to, the following types of
21 products: small and relatively inexpensive articles memorializing a special occasion, decorative
22 or comic articles, fashion accessaries (e.g., trinket jewelry and charm bracelets), birthstone items,
23 special occasion gifts (e.g., for Mother's Day), small plastic toys and party favors, and
24 personalized items. The giftware industry recognizes Souvenirs & Novelties as a distinct
25 submarket. Products within this market are not used as home decorative accessories or as
26 seasonal decorations. The products within this market are complements as consumers would
27 seek souvenirs or novelties as commemorative presents. Consistent with the industry's
28 recognition of Souvenirs & Novelties as a distinct submarket, the Souvenirs & Novelties market

1  defines a field of competition sufficiently distinct from the other three tied product markets.

2  Ganz's core line includes products that fall within the Souvenirs & Novelties market.

3    69.    The Home Decorative Accessories market is a tied product market. The Home

4  Decorative Accessories market is defined as the United States market for products designed and

5  manufactured to be bought to decorate the interior of a home. This market includes, but is not

6  limited to, the following types of products: picture frames, tableware, and ceramics. The

7  giftware industry recognizes Home Decorative Accessories as a distinct submarket. The

8  products within this market are specifically used to decorate the interior of a home and are

9  therefore reasonably interchangeable in their use. Consistent with the industry's recognition of

10 Home Decorative Accessories as a distinct submarket, the Home Decorative Accessories market

11 defines a field of competition sufficiently distinct from the other three tied product markets.

12 Ganz's core line includes products that fall within the Home and Decorative Accessories market.

13    70.    The Seasonal Decorations market is a tied product market. The Seasonal

14 Decorations market is defined as the United States market for products designed and

15 manufactured to be bought for holidays, such as Christmas and Thanksgiving. This market

16 includes, but is not limited to the following types of products: ornaments, decorations, and

17 keepsakes. The giftware industry recognizes Seasonal Decorations as a distinct submarket. The

18 products within this market are specifically intended for purchase and use at holidays and are

19 therefore reasonably interchangeable. Consistent with the industry's recognition of Home

20 Decorative Accessories as a distinct submarket, the Seasonal Decorations market defines a field

21 of competition sufficiently distinct from the other three tied product markets. Ganz's core line

22 includes products that fall within the Seasonal Decorations market.

23                                    **VII.**

24    **DEFENDANTS' WRONGFUL CONDUCT AND ANTITRUST VIOLATIONS**

25    71.    Ganz instituted a policy whereby persons and entities in the United States who did

26 not have an account with Ganz and wanted to purchase Webkinz had to purchase tied Ganz

27 products before becoming eligible to purchase Webkinz and beginning in 2006 existing

28 customers were required to do the same. Ganz enforced this policy on a nationwide basis.

72. In addition to the co-ordering requirement, Ganz has a Loyalty Program for Webkinz retailers that gives priority shipping for ordering more than specified levels of core products within a twelve month period. Also, the greater the dollar value of core products ordered, the greater the maximum number of pieces the retailer can order of each Webkinz style.

73. Ganz forced Class members to order the tied Ganz products if they wanted to sell Webkinz, even if they did not want to order the tied Ganz products.

74. Ganz's anticompetitive conduct is objectively baseless and subjectively motivated by a desire to restrict competition in the relevant tying and tied product markets. The adoption and enforcement of the tying arrangement has had the effect of restraining competition in the relevant tying and tied product markets.

75. In order to ensure that they receive genuine Webkinz products, Plaintiffs and Class members must order Webkinz directly from Ganz.

76. Ganz adopted and implemented these policies and practices to preserve and extend its dominant position in the relevant market. Through these policies and practices, Ganz succeeded in making it more difficult for Plaintiffs and Class members to obtain Webkinz products separately and without the added cost of obtaining unwanted tied Ganz "core products" and to sell products that compete with the tied Ganz products by forcing Plaintiff to stock limited retail shelf space with Ganz's tied products, reducing Plaintiffs' ability to sell competing products. Ganz's unlawful conduct has had the effect of reducing the level of competition in the relevant tying market and in the market for the tied Ganz products that would have otherwise prevailed. At the same time, Ganz's conduct has allowed it to maintain and/or increase its market share in those markets.

77. Ganz used its dominant position in the market for toys combined with online gaming to force Plaintiffs and Class members to purchase the tied Ganz products. As Ganz's power in the market for toys combined with online gaming increased, it began conditioning the sales of Webkinz on the purchase of the tied Ganz products, thereby restraining competition in the markets for the tying and tied Ganz products and artificially increasing its revenues and profits from the tying and tied Ganz products.

LAW OFFICES
COTCHETT,
PITRE
& MCCARTHY

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

18

1    78.   Ganz claims that the tying arrangement is necessary to protect customers who

2    already have accounts with Ganz. This explanation is pretextual because the tying arrangement

3    does not tangibly benefit Ganz's existing customers. However, Ganz benefits from increased

4    revenues and profits derived from the tied Ganz products. Further, the tying arrangement does

5    not provide any benefit to Plaintiffs or to consumers that is defensible under the federal antitrust

6    laws. Thus, there is no legitimate reason for Defendants to require Plaintiff and Class members

7    to order the tied Ganz products to become eligible to purchase Webkinz.

8                                              **VIII.**

9    **PLAINTIFFS AND THE SHERMAN/CLAYTON CLASS MEMBERS SUFFERED
     ANTITRUST INJURY BECAUSE OF DEFENDANTS' CONDUCT**

10

11   79.   Through their unlawful acts, Defendants acted to the detriment of Plaintiffs and

12   Class members, resulting in Defendants reaping unlawful revenues and profits from the orders of

13   Ganz products.

14   80.   As a direct and proximate result of Ganz's conduct, Plaintiffs and the Class

15   members have been injured in their property and business in an amount to be determined

16   according to proof. Plaintiffs and Class members have suffered monetary damages from being

17   coerced into purchasing the tied Ganz products as a condition of purchasing Webkinz.

18   Defendants' practices have forced Plaintiffs and Class members to pay for and stock items that

19   take up space that could be used for products that compete against the tied Ganz products, and

20   prevented Plaintiffs and the Class members from purchasing and selling competing products.

21                                              **IX.**

22                **DEFENDANTS' UNFAIR AND DECEPTIVE PRACTICES**

23   81.   As alleged herein, Defendants conditioned the purchase of Webkinz to the

24   purchase of products from their core line.

25   82.   Defendants represented that retailers purchasing specified levels of core products

26   would receive priority shipping. Further, Defendants represented that the greater the dollar

27   amount of core products ordered, the greater the maximum number of pieces retailers could order

28   of each Webkinz style.

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

19

83.     For instance, Defendants adopted a "Webkinz Loyalty Program" and represented to retailers that those who purchased more than $10,000 in core products ("Gold" customers), would receive priority shipping, followed by retailers who purchased between $5,000 and $9,999 in core products ("Silver" customers), and then retailers who purchased between $2,500 and $4,999 in core products ("Bronze" customers).

84.     Defendants knew, however, that they could not supply a reasonably expected demand of Webkinz within a reasonable time because they were supplying chains such as Target and other discount stores contrary to their representations to retailers such as Plaintiffs. Defendants nonetheless continued to take orders from Plaintiffs for Webkinz and core products.

85.     Upon receiving orders for Webkinz which were conditioned on the order and purchase of core products, Defendants promptly shipped the core products and demanded payment for the core products. Because Defendants could not supply a reasonably expected demand of Webkinz, the shipments of Webkinz orders were delayed for many months or never delivered at all. This pattern of delayed delivery was done despite the retailer "Requested Ship Date" contained on the face of each and every Ganz order form completed by its sales representatives.

86.     Often times, retailers wished to cancel their Webkinz orders because shipments were backordered for several months and the retailers could no longer sell them as they were either seasonal Webkinz styles or the Webkinz styles fell out of popularity and were replaced by more current products. Despite a request to cancel, Defendants nevertheless continued to ship backordered Webkinz products. Ganz refused to allow cancellations of late shipments of Webkinz products, which in many instances were shipped after the allowable cancellation date on Ganz's order form.

87.     Defendants instituted a policy prohibiting retailers from canceling, refusing or returning orders for the core products, although it did not ship Webkinz orders within a reasonable time.

88.     Defendants also instituted a policy prohibiting retailers from canceling, refusing or returning Webkinz orders unless (1) the Webkinz order was not shipped within nine months

1 from the order date or the date the product was released, whichever was the latest; (2) the
2 retailer's account was current; and (3) delayed shipping was not requested by the retailer. If a
3 retailer did not meet these conditions, Defendants required a payment of 50% of the price of the
4 cancelled or refused Webkinz products. Compounding this policy, Ganz deleted the "cancel
5 date" on late orders where the delivery date was already past the cancellation date on Ganz's
6 order forms, leaving Plaintiffs and Class members with no recourse.

7       89. Defendants debited the retailer's credit cards upon shipment despite the fact that
8 Ganz knew from it's own order forms that the shipments of Webkinz products were substantially
9 beyond the retailer's requested shipping date and many times beyond the cancellation date on the
10 order form.

11       90. Defendants baited retailers into purchasing core and Webkinz products with the
12 promise that retailers would have a geographic or territorial exclusivity to sell Webkinz products
13 and that chain and discount stores would not be supplied Webkinz, when, in fact, Ganz's
14 Webkinz products were for sale at Wal-Mart, Target and other chain and discount stores
15 throughout the country.

16       91. Additionally, Defendants imposed "service charges" on monthly statements for
17 products sold to retailers as part of the Defendants' unfair and deceptive acts and practices.

18       92. At the time retailers placed an order for Webkinz and the required core products,
19 Defendants knew that they could not supply a reasonably expected demand of Webkinz orders
20 within a reasonable time, but failed to disclose and/or inadequately disclosed these material facts
21 to retailers with an intent to induce retailers to order more Webkinz and more core products.

22 **X.**

23 **COUNT I**

24 **(Violation of Sherman Act § 1 and Clayton Act § 3)**

25       93. Plaintiffs incorporate by reference all the allegations set forth above as if fully set
26 herein.

27       94. Through its co-ordering requirement, Ganz has conditioned the sale of Webkinz
28 (the "tying product") to the order of the tied Ganz products (the "tied products"). Ganz has sold

LAW OFFICES
COTCHETT,
PITRE
& McCARTHY

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

21

1  Webkinz to Plaintiffs and Class members on the condition that they also order the tied Ganz
2  products.

3       95.     The tying product – Webkinz – is a separate product from the tied Ganz products.
4  Demand for the products can be separated, and to the extent there is any demand for the tied
5  products, there is sufficient demand for Webkinz and the tied products separately that it is
6  economically efficient to offer the products separately.

7       96.     Ganz has used its economic power in the relevant product market to force Class
8  members to purchase the tied Ganz products in order to sell Webkinz.

9       97.     Ganz has used its co-ordering requirement to preserve and extend its dominant
10 position in the tying and tied relevant markets. This requirement has restrained trade and harmed
11 competition in the relevant market.

12      98.     Ganz has sufficient economic power in the United States market for toys
13 combined with online gaming to enable it to restrain trade appreciably in the tying and tied
14 product markets. Ganz's tying arrangement has been successful and affects a substantial volume
15 of commerce. Ganz has been able to force Class members to order the tied Ganz products if they
16 want to order Webkinz. If Ganz had not imposed the tying arrangement, many Class members
17 would not have ordered the tied Ganz products, or would have ordered smaller amounts than
18 Ganz forced them to order and would have bought other products from competitors of Ganz and
19 sold those products to their customers.

20      99.     Ganz has a financial interest in the sale of the tied products so as to increase sales
21 and its share in the tied product markets.

22      100.    Ganz's tying arrangement has harmed competition and foreclosed a substantial
23 amount of interstate commerce in the tied product markets.

24      101.    Ganz's tying arrangement has caused monetary injury to Class members.

25      102.    Ganz's tying arrangement involving Webkinz and the tied Ganz products is
26 objectively baseless and subjectively motivated by a desire to restrict competition in the tying and
27 tied markets. Ganz's practices have restricted Plaintiffs' and Class members' capital that they
28 otherwise would use to purchase competing products in the tying and tied product markets. This

1 arrangement imposes excessive burdens, and any legitimate business purposes could be

2 accomplished by less restrictive means.

3     103.    This tying arrangement constitutes a *per se* violation of Section 1 of the Sherman

4 Act (15 U.S.C. § 1) and Section 3 of the Clayton Act (15 U.S.C. § 14).

## XI.

## COUNT II

7 **(Violation of Connecticut Unfair Trade Practices Act, Gen. Stat. Ann. § 42-110a et seq.)**

8     104.    Plaintiff Freedom Candle Company incorporates by reference all the allegations

9 set forth above as if fully set forth herein.

10     105.    Plaintiff, Freedom Candle Company, brings this claim on behalf of all persons and

11 entities who ordered Webkinz and "core line" products but whose shipments of Webkinz

12 products Ganz failed to deliver reasonably timely manner.

13     106.    Defendants are business enterprises engaged in trade or commerce, including but

14 not limited to the manufacture, distribution, sales and marketing of Ganz products, including the

15 core and Webkinz products described herein.

16     107.    Defendants' conduct as described in the foregoing paragraphs has been unethical,

17 immoral, deceptive and unscrupulous, and includes but is not limited to the following:

18             a.    Advertising and/or offering for sale Webkinz products with the intent not

19                   to sell them as advertised;

20             b.    Advertising and/or offering for sale Webkinz products with the intent not

21                   to supply a reasonably expected demand; and

22             c.    Failing to disclose and/or inadequately disclosing, concealing or

23                   suppressing material facts, in connection with the tying scheme, that

24                   Defendants would not supply a reasonably expected demand of Webkinz

25                   products within a reasonable time.

26     108.    Defendants' conduct constitutes unfair and deceptive acts and practices in the

27 conduct of trade or commerce in violation of the Connecticut Unfair Trade Practices Act, Conn.

28 Gen. Stat. Ann. § 42-110a *et seq.*



LAW OFFICES
COTCHETT,
PITRE
& MCCARTHY

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

23

1    109.    Plaintiff and members of the Class have been damaged and have suffered an

2 ascertainable loss of money and/or property.

3    110.    Pursuant to Conn. Gen. Stat. § 42-110g, Plaintiff and Class members seek

4 damages, actual and punitive; equitable relief, including restitution of all monies paid to

5 Defendants as a result of their unfair and deceptive acts and practices; injunctive relief enjoining

6 Defendants from their unfair and deceptive acts and practices; declaratory relief; attorneys' fees

7 and any other relief the Court deems proper.

8                                        **XII.**

9                                     **COUNT III**

10    **(Violation of Florida's Deceptive and Unfair Trade Practices Act,**
     **Fla. Stat. §§ 501.201 *et seq*.)**

11

12    111.    Plaintiff Widensky's Clothing Boutique, Inc. incorporates by reference all the

13 allegations set forth above as if fully set herein.

14    112.    Plaintiff, Widensky's Clothing Boutique, Inc., brings this claim on behalf of all

15 persons and entities who ordered Webkinz and "core line" products but whose shipments of

16 Webkinz products Ganz failed to deliver in a reasonably timely manner.

17    113.    By its conduct, including the failure to disclose and/or inadequate disclosure of

18 materials facts as alleged herein, Defendants have engaged in deceptive acts and practices in the

19 conduct of business, trade, and commerce, and in the furnishing of goods within the state of

20 Florida, all in violation of Florida's Deceptive and Unfair Trade Practices Act,

21 Fla. Stat. §§ 501.201 *et seq*.

22    114.    Defendants intentionally, negligently or recklessly made misleading or deceptive

23 representations concerning their Webkinz products, and concealed from, suppressed, failed to

24 disclose and/or inadequately disclosed material facts concerning its Webkinz products.

25 Defendants' illegal acts and practices include, but are not limited to, the following:

26            a.    Advertising and/or offering for sale Webkinz products with the intent not

27                  to sell them as advertised;

28    ///



LAW OFFICES
COTCHETT,
PITRE
& MCCARTHY

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

24

1     b.  Advertising and/or offering for sale Webkinz products with the intent not

2        to supply a reasonably expected demand; and

3     c.  Failing to disclose and/or inadequately disclosing, concealing and

4        suppressing material facts, in connection with the tying scheme, that

5        Defendants would not supply a reasonably expected demand of Webkinz

6        products within a reasonable time.

7  115.  Defendants' acts and practices, as alleged herein, were materially deceptive or

8 misleading to a reasonable person or consumer. The facts concealed, suppressed, not disclosed

9 and/or inadequately disclosed by Defendants to Plaintiff and Class members are material facts

10 that a reasonable person acting reasonably would have considered to be important in deciding

11 whether to place orders for Webkinz and core products.

12  116.  Fla. Stat. § 501.211 provides for private right of action for anyone "aggrieved by a

13 violation of the [act]."

14  117.  Plaintiff and Class members are person[s] who have been injured by reason of

15 the Defendants' violation of Fla. Stat. Ann. § 501.201 *et seq.*, in that, among other things, (a)

16 they could not sell the core and Webkinz products they purchased; and (b) they would not have

17 otherwise purchased the core and Webkinz products they ordered.

18  118.  Defendants willfully and knowingly engaged in the conduct described above.

19 Plaintiff and Class members are entitled to all applicable damages; injunctive relief enjoining

20 Defendants from their unfair and deceptive acts and practices; declaratory relief; attorneys' fees

21 pursuant to Fla. Stat. § 501.211, and other non-monetary relief as appropriate.

22              **XIII.**

23            **COUNT IV**

24  **(Violation of New York's Consumer Protection From Deceptive Acts and Practices**
        **statutes, N.Y. Gen. Bus. Law §§ 349 *et seq.*)**

25

26  119.  Plaintiff, Forget-me-not Keepsakes & Crafts, Inc., incorporates by reference all

27 the allegations set forth above as if fully set herein.

28 ///


LAW OFFICES
COTCHETT,
PITRE
& MCCARTHY

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

25

1      120.   Plaintiff, Forget-me-not Keepsakes & Crafts, Inc., brings this claim on behalf of

2   all persons and entities who ordered Webkinz and "core line" products but whose shipments of

3   Webkinz products Ganz failed to deliver in a reasonably timely manner.

4      121.   By its conduct, including the failure to disclose and/or inadequate disclosure of

5   materials facts as alleged herein, Defendants have engaged in deceptive acts and practices in the

6   conduct of business, trade, and commerce, and in the furnishing of goods within New York State,

7   all in violation of New York General Business Law ("GBL") § 349 *et seq*.

8      122.   Defendants intentionally, negligently or recklessly made misleading or deceptive

9   representations concerning its Webkinz products, and concealed from, suppressed, failed to

10   disclose and/or inadequately disclosed material facts concerning its Webkinz products.

11   Defendants' illegal acts and practices include, but are not limited to, the following:

12          a.      Advertising and/or offering for sale Webkinz products with the intent not

13                  to sell them as advertised;

14          b.      Advertising and/or offering for sale Webkinz products with the intent not

15                  to supply a reasonably expected demand; and

16          c.      Failing to disclose and/or inadequately disclosing, concealing and

17                  suppressing material facts, in connection with the tying scheme, that

18                  Defendants would not supply a reasonably expected demand of Webkinz

19                  products within a reasonable time.

20      123.   Defendants' acts and practices, as alleged herein, were: consumer oriented as

21   Plaintiff and Class members could not supply consumer demand, among other things; materially

22   deceptive or misleading to a reasonable person or consumer, and had a broad impact on

23   consumers at large and the public interest. The facts concealed, suppressed, not disclosed and/or

24   inadequately disclosed by Defendants to Plaintiff and Class members are material facts that a

25   reasonable person acting reasonably would have considered to be important in deciding whether

26   to place orders for Webkinz and core products.

27

28   / / /

1    124.   GBL § 349(h) provides in relevant part that "... any person who has been injured

2 by reason of any violation of this section may bring an action in his own name to enjoin such

3 unlawful act or practice, [and] an action to recover his actual damages ..."

4    125.   Plaintiff and Class members are "person[s] who have been injured" by reason of

5 the Defendants' violation of GBL § 349, in that, among other things, (a) they could not sell the

6 core and Webkinz products they purchased; and (b) they would not have otherwise purchased the

7 core and Webkinz products they ordered.

8    126.   Defendants willing and knowingly engaged in the conduct described above.

9 Plaintiff and Class members are entitled to all applicable damages; injunctive relief enjoining

10 Defendants from their unfair and deceptive acts and practices; declaratory relief; attorneys' fees

11 pursuant to New York GBL § 349(h), and other non-monetary relief as appropriate.

## XIV.

### PRAYER FOR RELIEF

14     WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for relief as

15 follows:

16    A.   For an order certifying the proposed Nationwide and Multi-State Classes under

17 Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as Class Representatives

18 and their attorneys as Class Counsel to represent the Class members;

19    B.   The Court declare and decree that Defendants' acts, conduct and practices are

20 unlawful under Section 1 of the Sherman Act (15 U.S.C. § 1) and Section 3 of the Clayton Act

21 (15 U.S.C. § 14);

22    C.   The Court declare and decree that Defendants' acts violate the state statutes

23 alleged herein;

24    D.   The Court permanently enjoin Defendants, as well as its officers, agents, servants,

25 employees and attorneys who shall receive actual notice of the Court's injunction, from

26 continuing to engage in those acts, forms of conduct and practices found to be illegal, as

27 provided by Section 16 of the Clayton Act (15 U.S.C. § 26; *see also* 15 U.S.C. § 4), Conn. Gen.

28 Stat. § 42-110g, Fla. Stat. § 501.211, and New York GBL § 349(h);



LAW OFFICES
COTCHETT,
PITRE
& MCCARTHY

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

27

1     E.     The Court award Plaintiffs and members of the Sherman/Clayton Class threefold

2 their actual antitrust damages sustained as a result of Defendants' antitrust violations, as provided

3 by Section 4 of the Clayton Act (15 U.S.C. § 15);

4     F.     The Court award Plaintiffs and the Classes all damages available under the law,

5 and that a judgment be entered in favor of Plaintiffs and the Class;

6     G.     The Court award Plaintiffs and members of the Classes restitution, including

7 disgorgement of profits obtained by Defendants as a result of their acts of unfair competition and

8 acts of unjust enrichment;

9     H.     The Court award Plaintiffs and members of the Sherman/Clayton Class threefold

10 their actual antitrust damages sustained as a result of Defendants' antitrust violations, as provided

11 by Section 4 of the Clayton Act (15 U.S.C. § 15);

12     I.     The Court award Plaintiffs and members of the Class reasonable attorneys' fees

13 and costs as provided by Section 4 of the Clayton Act (15 U.S.C. § 15), Conn. Gen. Stat. §

14 42-110g, Fla. Stat. § 501.211, New York GBL § 349(h), and the common fund doctrine;

15     J.     The Court award Plaintiffs and members of the Sherman/Clayton Class pre-

16 judgment and post-judgment interest as permitted by law; and

17     K.     The Court award Plaintiffs and members of the Classes such other and further

18 relief at law or in equity as the Court may deem just and proper.

19

20

21 DATED: August 24, 2009

22

23

24

25

26

27

28

STEVEN N. WILLIAMS (CA # 250940)
swilliams@cpmlegal.com
**COTCHETT, PITRE& McCARTHY**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Fax:(650) 697-0577

*Counsel for Plaintiffs and the Classes*

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

28

1

## **JURY TRIAL DEMAND**

2          Plaintiffs, pursuant to Federal Rule of Civil Procedure 38, demand a trial by jury of all

3    issues which are subject to adjudication by a trier of fact.

4

5    Dated: August 24, 2009                    **COTCHETT, PITRE & McCARTHY**

6

7                                             By: _____
                                                 STEVEN N. WILLIAMS
8                                                *Counsel for Plaintiffs and the Classes*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES
COTCHETT,
PITRE
& McCARTHY

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL